

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00089-CR

CHRISTINA LEEANN SCHULTZ, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 13th District Court
Navarro County, Texas
Trial Court No. C40800-CR

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

MEMORANDUM OPINION

A Navarro County[1] jury found Christina Leeann Schultz guilty of theft of property valued at $2,500.00 or more but less than $30,000.00. *See* TEX. PENAL CODE ANN. § 31.03(e)(4)(A). Schultz was a nurse at a nursing home in Corsicana, Texas. The property was a ring belonging to a nursing home resident. The trial court sentenced Schultz to two years' confinement in state jail, suspended for five years, assessed a $5,000.00 fine, and confined her in the county jail for thirty days.

At trial, Schultz testified that she found the ring on nursing home grounds and, since she did not know who the ring belonged to, she took it to a pawn shop and sold it. Schultz testified that her conduct was not theft. The State contended that, even if Schultz were to be believed, her "finders keepers" approach is contrary to what is expected of nurses at nursing homes and is contrary to the law. More simply, the State contended that Schultz did not find the ring but instead removed it from the resident's hand.

On appeal, Schultz contends that the trial court (1) denied her the right to put on a defense, (2) erred by admitting extraneous-offense testimony because its probative value was outweighed by the danger of unfair prejudice, (3) erred by admitting extraneous-offense testimony because the State failed to provide proper notice, and (4) erred by admitting extraneous-offense testimony because the court failed to provide a limiting instruction at the time the evidence was admitted. Schultz's latter three points concern testimony from the nursing

---

[1]Originally appealed to the Tenth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). We are unaware of any conflict between precedent of the Tenth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

home's director that the ethical standards of the Texas Board of Nursing would prohibit Schultz from taking and selling a ring found on nursing home grounds.

We affirm the trial court's judgment because Schultz did not object to the trial court on constitutional "complete defense" grounds, and even if there were error in admitting the testimony about the ethical standards, it was harmless because the jury heard properly admitted evidence that Schultz did not have the consent of the resident to take and sell the ring, evidence that the nursing home expected its nurses to turn in lost property, and evidence supporting the conclusion that Schultz did not find the ring as she claimed but instead took it from the resident.

## I.    Factual and Procedural Background

### A.    What the Jury Heard

In late October into early November 2020, Christine Tekell was a resident at the Legacy West Nursing Home in Corsicana, Texas.  At trial, Tekell's daughter, Ashley Parker, was the first witness to testify.  Parker advised that Tekell had been diagnosed with Alzheimer's dementia in 2014 and was placed in Legacy West in February 2020.  During the relevant time, Tekell needed assistance in taking care of some of her basic needs, while others had to be entirely taken care of for her.  At that time, Tekell could not carry on a conversation.  Her dementia had progressed to the point that, aside from isolated words and noises, Tekell was unable to speak.  Parker testified that Tekell lacked the wherewithal to consent to anything regarding the ring.  Parker testified that she had power of attorney over her mother and that she never consented to Schultz taking the ring.

3

The ring was Tekell's engagement ring given to her by her late husband when they were in college. In 2018, when Tekell's knuckles had become arthritic, her husband had had an adjustable shank added so that the ring would still fit her finger. Parker testified that, as of the fall of 2020, Tekell lacked the mental acuity and physical dexterity to manipulate the shank and, therefore, could not have removed the ring herself. Parker testified that she saw the ring on her mother's hand on October 23, 2020. Due to COVID restrictions in the spring to summer of 2020, October 23rd was the first day Parker was able to be in the same room with her mother for months. Parker took a photo of her mother that day. The photo was admitted into evidence. It showed Tekell wearing the ring.

Tekell would show her ring to staff members if they asked her. Amber Walker, the director of nursing at Legacy West, testified that she never saw Tekell take off her ring, and prior to the ring going missing, she never saw Tekell without it. Walker kept cookies or other treats in her office to give to the residents, as well as wipes for them to clean their hands with before having a treat. Tekell would come to Walker's office every day. They had a routine. Walker described it this way: "[E]very day, [Tekell] would wipe her hands and as she's wiping her hands, she would point to her ring by tapping her ring and she would babble to me and I would . . . tell her, it's a beautiful ring your husband must love you a lot."

Parker testified that, as of October 2020, her mother's condition was deteriorating and that, after consulting with the staff at Legacy West, she had decided to move Tekell to a facility that offered a higher level of care. On November 2, 2020, in preparation for the move to a new facility, Parker called Amber Nelson, the assistant director of nursing at Legacy West, and asked

4

that Nelson obtain the ring from Tekell for safekeeping during the move. Nelson testified that, following the call with Parker, she went to find Tekell to retrieve the ring. Nelson discovered Tekell in a state of distress, wringing her hands. The ring was gone.[2]

Nelson advised Parker that the ring was missing. Parker called the police to report the ring as being stolen.

The case was assigned to Detective Whitney Hawk with the Corsicana Police Department. Hawk testified that Legacy West employees had seen the ring on Tekell's hand as recently as October 30, 2020. Hawk testified that she obtained from Nelson a list of Legacy West employees who had been on duty during the end of October and beginning of November,[3] checked for recent pawn shop transactions by those individuals, and discovered that Schultz had sold a ring to a pawn shop in Grand Prairie on October 31, 2020. Based on information that Parker had provided, Hawk confirmed that the ring Schultz sold was Tekell's ring. Hawk retrieved the ring. Parker identified the ring at trial.

Following Schultz's arrest, Hawk interviewed Schultz. Schultz told Hawk that she found the ring near the fountain in the Legacy West parking lot. Schultz admitted to Hawk that she sold the ring to the Grand Prairie pawn shop. Schultz claimed a right to sell the ring.

At trial, Hawk testified, without objection, that, in her opinion, Schultz's actions were not justified. Hawk testified that, in her opinion, when Schultz took and sold the ring, Schultz knew

---

[2]The distress continued. Walker described Tekell's state in the following days this way: "She was visibly upset. She would be crying. She would constantly touch her hand again and cry and instead of her usual smile and babble, she would just, she would moan and cry."

[3]During her testimony, Schultz admitted that she had worked at Legacy West on October 30.

that it belonged to Tekell. Hawk further testified, again without objection, that "finders keepers" is not the law.

Rene Pillet, the administrator of Legacy West, testified that nursing home employees are told that they may not misappropriate resident property. Pillet testified that ingress and egress from the facility requires the use of a five-digit code on a keypad next to the door. Pillet testified that Tekell would not have had that code and, in any event, lacked the ability to enter a five-digit code. Pillet testified that the chances of Tekell getting outside and leaving the ring in the parking lot were "slim to none."

Pillet was asked whether it would be appropriate for a nurse to find a ring by the parking lot fountain, to keep it, and to sell it. Schutlz lodged a relevance objection. The State responded that the question was a proper matter for rebuttal since Schultz, in her statement to Detective Hawk, had claimed the right to take, to keep, and to sell the ring. The trial court overruled the relevance objection. Pillet answered that, in her opinion, taking, keeping, and selling the ring was "not the correct response." Pillet was then asked why that was her opinion. Without objection, Pillet answered, "Because if an item is missing or found on the facility property, then ethically morally, I think that those staff members should turn that into administration. So that we may do an investigation and find the rightful owner of the property." Pillet was then asked, again without objection, if she would expect found items to be turned in by nursing home employees in the normal routine of nursing home operations. Pillet answered, "Yes. That would be my expectation." Pillet testified that the Legacy West staff was alerted that Tekell's ring was

6

missing but that Schultz did not come forward to report finding a ring in the parking lot. Pillet testified, without objection, that Legacy West fired Schultz.

Schutlz testified to the same effect as in her interview with Hawk, i.e., that she had found a ring in the nursing home parking lot and then sold it. Schultz admitted that she did not make a report of a missing ring to the nursing home, either at the time she found it or when she received a cash offer for the ring. Schultz testified that, at the time she found the ring, took it, and sold it, she did not think it possible that it could be a resident's ring because the nursing home residents could not leave the facility and, hence, had no access to the parking lot. When asked if she had consent from Tekell to sell the ring, Schultz testified, "I found a ring."

Schultz's story that she found the ring was not consistent at all times to all people. Walker testified to a November 9, 2020, text exchange with Schultz in which Schultz denied telling "the police" that she had found the ring. At trial, Schultz was asked if she still contended that taking the ring was the right thing to do. Schultz declined to answer.

## B. What Schultz Contends the Jury Should Have Heard

By her first point of error, Schultz contends that the trial court "*denied Schultz the right to put on a defense*" by excluding testimony from Legacy West staff member Patti Bradley, a licensed vocational nurse (LVN), that Tekell would wander the halls of the nursing home, eat from the trays of other residents, act out by, among other things, hitting a nurse with a plastic cup, and take things from the rooms of other residents. Testimony to that effect was made on voir-dire examination outside of the presence of the jury. Bradley denied personal knowledge of Tekell taking things from other residents. Schultz then sought to impeach Bradley with nursing

7

home progress notes. Bradley again denied personal knowledge of Tekell taking things from other residents.

Schultz contended that Bradley's testimony was relevant to show "that someone had dropped [the ring] or someone moved it or Ms. Tekell moved it or [she had] maybe given it to somebody or traded or somehow it left her room as [Tekell] engaged in holding other people's items. Who knows what may have happened."

The State responded to that voir-dire testimony[4] with two main points. First, the State did not dispute that Tekell wandered the halls. That was something that the State elicited from witnesses including Parker and Walker. In Parker's words, "That's a symptom of dementia." Second, the State objected on grounds that the offered testimony was not relevant to theft of the ring. On that score, Bradley remembered Tekell's ring. To Bradley's knowledge, Tekell never took it off. After hearing that from Bradley, the trial court excluded Bradley's testimony.

Schultz made a similar proffer of testimony from Karen Benton, LVN. Outside of the jury's presence, Benton testified that she had a "[s]mall amount" of interaction with Tekell. Benton testified that "[Tekell] had things that [she] thought did not belong to her but [she] wasn't sure." Benton testified that she had no recollection of whether Tekell had a wedding ring. The trial court sustained the State's relevance objection to Benton's testimony.[5]

---

[4]We consider that testimony as a proffer for purposes of this appeal.

[5]The trial court did permit Benton to testify to matters regarding the layout of Legacy West and nursing shift schedules.

### C. What Schultz Contends the Jury Should Not Have Heard

By her second, third, and fourth points of error, Schultz contends that the trial court erred by admitting testimony from Pillet regarding the Texas Board of Nursing's ethical standards. That exchange took place immediately following Pillet's testimony that she would expect nurses at Legacy West to report property found on nursing home grounds. The standards themselves were not introduced as an exhibit, nor were they read verbatim. Over Schultz's objections, Pillet answered two questions. Pillet testified that, to her understanding of the ethical rules applicable to nurses, they prohibited the conduct as testified to by Schultz, i.e., finding property on nursing home grounds, taking it, and selling it. Pillet testified that, in her experience, there was nothing that justified the conduct testified to by Schultz.

## II. Schultz's First Point Was Not Preserved

"The Constitution guarantees defendants 'a meaningful opportunity to present a complete defense.'" *In re City of Lubbock*, 666 S.W.3d 546, 564 (Tex. Crim. App. 2023) (orig. proceeding) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). "This right is rooted in the Fourteenth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process and Confrontation Clauses." *In re City of Lubbock*, 666 S.W.3d at 564–65 (citing *Crane v. Kentucky*, 476 U.S. 683, 690, (1986)). "Accordingly, the exclusion of relevant, material, important evidence by application of rules that are arbitrary or disproportionate to their purpose may offend the Constitution." *Id.* at 565.

9

When the trial court excluded the testimony of Bradley and Benton, Schultz did not complain that the exclusion of their testimony violated Schultz's right to a "complete defense."[6] Nor did Schultz complain that the exclusion of their testimony presented a constitutional issue. Accordingly, this point of error was not preserved for our review. *See* TEX. R. APP. P. 33.1(a); *Leza v. State*, 351 S.W.3d 344, 360 (Tex. Crim. App. 2011) (finding "complete defense" not preserved where the defendant "never alerted the trial court in any way that exclusion of the statement would violate any federal constitutional right").

## III.    Error, if any, Regarding Schultz's Remaining Points of Error Was Harmless

Schultz lodged in the trial court, and lodges again here, several objections to Pillet's testimony that the ethical standards of the Texas Board of Nursing would prohibit finding and selling the ring in the manner Schultz testified that she did.

Schultz objects that Pillet's testimony about ethical standards presented an "extraneous offense" that was more prejudicial than probative, was admitted without proper notice, and was admitted without a contemporaneous limiting instruction. Schultz does not contend that any of her objections are constitutional.

"Non-constitutional errors require reversal only if they affect an appellant's substantial rights—*i.e.*, when they have a substantial and injurious effect or influence in determining the jury's verdict." *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023); (citing TEX. R. APP. P. 44.2(b)). *Cook* goes on to state: "In making this determination, the following nonexclusive factors are considered: the character of the alleged error and how it might be

---

[6]Notably, Schultz was able to present her "finders keepers" version of events through her own testimony. The jury also heard that Tekell was prone to wander.

10

considered in connection with other evidence; the nature of the evidence supporting the verdict; the existence and degree of additional evidence indicating guilt; whether the State emphasized the complained-of error; the trial court's instructions; the theory of the case; and, relevant voir dire." *Id.* "We will not overturn a conviction if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or did so only slightly." *Id.*

This analysis may be conducted without determining whether there was error. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) ("Assuming without deciding that the case summaries and disciplinary records were improperly admitted, our examination of the record in its entirety leads us to conclude that the alleged error did not affect a substantial right of the appellant.").

From Schultz's perspective, what played out in front of the jury was a battle over whether finding a ring in the nursing home parking lot counts as effective consent to take it and to sell it. Pillet's testimony about the ethical standards was merely one of several times the jury heard testimony on that question. The jury heard, without objection, from Hawk that Schultz's claim of consent was not justified. The jury also heard from Schutlz, who refused to answer whether she still believed that taking and selling the ring was justified. The jury also heard testimony from Pillet aside from the brief exchange about ethical standards. In particular, Pillet testified to her expectations as Legacy West's administrator.

In 1922, the Texas Court of Criminal Appeals heard a case regarding the theft of a suitcase from a train station. *Wright v. State*, 239 S.W. 976, 976 (Tex. Crim. App. 1922). The defendant appealed on the theory that the suitcase was legally ownerless and, thus, could not be

stolen. *Id.* The Texas Court of Criminal Appeals affirmed the conviction, holding that ownership was established. *Id.* The suitcase belonged to the ticketed passenger and was under the possession of the railroad's station agent. *Id.* "It is true that [the station agent] did not have it in his hands, but it was on the truck belonging to his employer, at its depot, and under the care, control, and management of [the station agent], within the meaning of the law." *Id.* Pillet, as the nursing home's administrator, was, by analogy, the station agent in the present situation. The nursing home parking lot was not a lawless no-man's land. It was subject to the control of the nursing home, as was Schultz, the nursing home's employee. The jury heard Pillet say that she would expect a ring found on the nursing home parking lot to be turned in so that the ring's rightful owner could be identified. Thus, even without Pillet's subsequent testimony regarding ethical standards, the jury had ample reason to reject Schultz's version of consent. That alone is reason to find the admission of the ethical standards testimony harmless. *See Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) ("[A]ny error in admitting the evidence was harmless in light of other properly admitted evidence proving the same fact.").

From the State's perspective, ethical standards about a supposedly "found" ring were beside the point; the question for the jury was whether Schultz's version of events was to be believed at all. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991) ("As fact[-]finder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties."). The jury was free to believe that Schultz took the ring from Tekell's finger and concocted the story of finding it after she was caught. There was ample evidence for the jury to conclude that Schutlz took the ring from

12

Tekell's finger. This evidence includes Tekell's inability to remove the ring, the importance of the ring to Tekell, Tekell's lack of access to the parking lot, and Schultz being on duty at the nursing home the day before Schutlz sold the ring.

Error in admitting the ethical standards testimony, if any, did not affect Schultz's substantial rights. Having examined the entire record, we are fairly assured that the brief exchange about ethical standards had slight, if any, effect on the jury.

We reject Schultz's second, third, and fourth points of error.

We affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:    October 16, 2023
Date Decided:     December 22, 2023

Do Not Publish